UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERALDO OJITO,<br><br>　　　　　　Petitioner,<br><br>v.<br><br>KEN CLARK, Warden,<br><br>　　　　　　Respondent. | Case No. 09-CV-2127-LAB (JMA)<br><br>**REPORT AND RECOMMENDATION RE DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

**I.　Introduction**

Petitioner Geraldo Ojito ("Ojito" or "Petitioner") is a California state prisoner proceeding *pro se* with a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. He was convicted by a jury in San Diego County Superior Court, consolidated case numbers SCD 169899 / SCD 174154, of two counts of second degree murder (Cal. Penal Code § 187(a)). (Lodgment No. 8, Clerk's Transcript ("CT") at 285-93.)[1] Petitioner asserts the trial court violated his due process rights by admitting the following into evidence: (1) photographs of Petitioner brandishing guns, (2) evidence that Petitioner possessed an inoperable firearm when he was arrested, (3) violent lyrics

---

[1] The jury also convicted Petitioner on four counts of premeditated attempted murder, one count of mayhem, and one count of shooting into an occupied vehicle. These convictions were reversed on appeal. People v. Ojito, No. D049765, slip op. (Cal. Ct. App. Aug. 18, 2008) [(Lodgment No. 4)].

adopted by Petitioner from other music, and (4) gang evidence.  Petitioner contends that the cumulative impact of this evidence deprived him of his Fourteenth Amendment right to a fundamentally fair trial.  (Pet. at 6.)

The Court has considered the Petition, Respondent's Answer and Memorandum of Points and Authorities in support thereof, Petitioner's Traverse, and all the supporting documents submitted by the parties.  Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Court recommends that the Petition be **DENIED**.

## II.    Factual Background

The following statement of facts is taken from the California Court of Appeal opinion, People v. Ojito, No. D049765, slip op. (Cal. Ct. App. Aug. 18, 2008).  (Lodgment No. 4.)  This Court gives deference to state court findings of fact and presumes them to be correct.  Tilcock v. Budge, 538 F.3d 1138, 1141 (9th Cir. 2008).  Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  Id.; see also 28 U.S.C. § 2254(e)(1).  The facts as found by the state appellate court are as follows:

> The crimes were committed as part of the familiar saga of cyclical violence between rival gangs.  The TNS gang, to which Ojito (aka Mist) belonged and of which he was considered a leader, were rivals of the KN gang.  All of the victims were associated with or connected to the KN gang.
>
> A.    The March 2002 Murders
>
> On March 1, 2002, six TNS members, including Ojito, were gathered at Ojito's apartment.  Around 4:00 p.m., a large group of young men affiliated with KN gathered near a bus stop outside Ojito's apartment building.  They were looking towards Ojito's apartment complex and were throwing gang signs identifying themselves as KN members.
>
> Ojito's group went outside to investigate the situation.  As Ojito emerged from the driveway and stepped outside the security gate, someone from the KN group said, "There he is."  Two members of the KN group, Larson Tufi and Jose Alegria, separated themselves from the group and took a few steps toward Ojito.  One made a motion as if to indicate he had a gun in his waistband and Ojito responded by making the same sort of motion.
>
> Tufi and Alegria began running toward Ojito.  One of them started shooting at Ojito with a BB gun, and some of the BB's struck Ojito on his face and head.  Ojito nevertheless ran toward them, and the two turned and began to flee.  As the two fled, one of them fired over his shoulder at

the pursuing Ojito. As Ojito was chasing them, he fired numerous shots with his .38 caliber handgun. One bullet struck Tufi in the back, killing him. Another shot struck Alegria in the back, killing him.

Later that evening, Ojito told Jesus Morales, who was with Ojito during the confrontation and was a TNS member, that one of the KN members had pulled out a BB gun and shot at Ojito with BB's. He told Morales some of the BB's had struck Ojito's back and face, and that Ojito had become upset and shot toward the person holding the BB gun. Other than the BB gun, Ojito did not mention seeing any other weapon.

Another person with Ojito at his apartment on the day of the confrontation, Raul Estrada, stated the two groups had been trading derogatory remarks with each other, and Estrada and two other TNS members had charged toward the KN group, intending to fight them. A member of the KN group pulled out a pellet gun and started shooting. Estrada then heard loud gunshots and saw the pellet gun holder fall, and then Estrada heard additional shots.

When Ojito was arrested in September 2002, he told police that he knew one of the victims had shot at him with a BB gun. He also told police KN members had engaged in various acts of vandalism at his home before the shooting.

B.   The Freeway Shooting

On September 10, 2002, Zet Martinez (a member of the KN gang who had been near Tufi's body immediately after he was shot,) was attacked and beaten by Ojito and another TNS member. Zet's mother arrived and tried to stop the attack. Ojito eventually ceased the assault but, before leaving, threatened Zet, stating he (Ojito) would "smoke [Zet's] ass like [he] smoked [his] f----ing friends."

On September 13, Zet's older brother (Julio) asked Zet to get into Julio's car to see if they could find the people who attacked Zet. Julio and Zet were also accompanied by Zeat (Zet's twin brother) and a fourth person (Andres Campos). On that day, Ojito was a passenger in a car being driven by Morales. The other passengers in Morales's car were Fivol (Ojito's brother), Marlen Gallardo, and Marcia Lucero.

When Morales's car neared 36th and Market, they saw "Chelli" (Ojito's girlfriend) and pulled over. Chelli told them a group of KN members was looking for Ojito. As they were talking Chelli saw the KN group in Julio's car approaching their location, and pointed out the group to Ojito.

Julio spotted Ojito sitting in Morales's parked car. Julio pulled over and stopped near Morales's car. Julio and Zeat (carrying a stick) got out and began to approach Morales's car, challenging Ojito to a "one-on-one" fight. Ojito stepped from the parked car, apparently wearing gloves and holding a gun covered by a towel, which he was pointing at Julio, and began to approach Julio. Julio and Zeat saw the gun and immediately ran back to Julio's car, jumped in, and drove off as Ojito pursued on foot while pointing the gun at Julio's car.

Ojito jumped back into Morales's car and, at Ojito's direction, they began pursuing Julio's car onto the freeway. A car chase ensued, with

occupants throwing gang signs at each other. Ojito said "f--- it" and told Morales to pull alongside Julio's car, saying, "Get them" numerous times.

Morales's car finally pulled even with Julio's car on the freeway but remained separated from Julio's car by two empty lanes. Ojito told Morales to pull next to Julio, but when Morales instead moved into Julio's lane in front of Julio, Ojito said "what the f--- are you doing?" However, Ojito (who had the gun in his hand) said he could lean out the window and fire back at Julio's car. Julio's car was behind and moving closer to Morales's car and made contact with Morales's rear bumper.[2] Julio's car then pulled alongside Morales's car on the driver's side, away from Ojito, and was less than a foot from Morales's car. Ojito reached across Morales and fired a shot into Julio's car. The shot struck Zeat's face and caused him substantial bodily harm.

After the first shot was fired, Julio's car pulled up ahead of Morales's car and Julio's group began throwing objects out the window towards Morales's car. Julio's car was moving toward the right lane to leave the freeway, and as Morales's car passed by Julio's car, Ojito fired several more shots at Julio's car from the front passenger's side window. When Morales failed to follow, Ojito expressed anger that Morales had not followed Julio.

After the freeway confrontation, Morales drove everyone back to the motel room where he was staying. At the hotel room, Ojito made telephone calls during which he said, "we got those faggots" and "we got them Korn Nuts," derogatory terms used by TNS members to refer to KN members. Ojito seemed happy and excited when he made those statements. Later that day, Ojito told Morales he wished Morales had followed Julio's car when it left the freeway so Ojito "could finish it off."

C.   Ojito's Statements to Police

On September 24, police arrested Ojito at the home of Jose Rodriguez, another TNS member. Police found several items of evidence at Rodriguez's home, including a handgun with a missing firing pin (which Ojito admitted was his), and several albums with photographs of Ojito posing with fellow gang members and guns.

During his interview with police, Ojito admitted he was the shooter at the March 2002 killings and the September 2002 freeway shooting. He stated that, just prior to the March 2002 shooting, the victims had been laughing, "talking shit" and using disrespectful language toward Ojito's gang, and he had shot them after one of the victims shot at him first with a BB gun and had struck him several times. Ojito said he got tired and mad at being shot with BB's, and fired two shots that caused everyone to start running away. He fired again, hitting one of the victims in the back as the victim was running away, and shot the other victim in the back of the head.

D.   The Disputed Evidence

Detective Rounds, testifying at Ojito's preliminary hearing, repeated statements made by Marcia Lucero to Rounds about Ojito's conduct and statements made during the freeway shooting. Ojito wrote a

4

>letter to a friend, two weeks after his preliminary hearing, in which he expressed anger at Lucero and labeled her a "rat." Over Ojito's objection, the content of Lucero's statements to Rounds was admitted at trial as an "adoptive admission . . . ."
>
>A gang expert testified generally about gang culture and mores, and about Ojito's and the victims' membership in the rival gangs. The court allowed this evidence, along with photographs showing Ojito with guns and other gang members, Ojito's handwritten rap lyrics, and evidence he possessed the inoperable gun. Ojito objected to much of this evidence. . . .
>
>E.     The Defense
>
>Ojito did not testify. He asserted the prosecution evidence lacked credibility because of inconsistencies and because the witnesses received favorable treatment from the prosecution in exchange for their testimony. [He] argued the evidence showed he acted in self-defense in both incidents.
>
>>[2] Morales later checked his rear bumper and saw a dent and chipped paint that had not been there prior to the incident. However, Morales was arrested a week after the freeway incident, and police photographs of the rear bumper showed no damage. Police found five shell casings near the freeway exit ramp where Morales's car ultimate broke away from Julio's car, and police found that several bullets had struck Julio's car.

(Lodgment No. 4 at 2-7.)

### III.     Procedural Background

On December 2, 2003, the District Attorney for the County of San Diego filed an Amended Consolidated Information charging Petitioner with two counts of murder, four counts of premeditated attempted murder, one count of mayhem, four counts of assault with a semi-automatic firearm, and one count of shooting into an occupied vehicle. (CT at 11-17.) On January 15, 2004, a jury found Petitioner guilty on the murder, attempted murder, mayhem, and shooting into an occupied vehicle charges. (CT at 626-29.)

Petitioner appealed to the California Court of Appeal, Fourth Appellate District, Division One ("California Court of Appeal"). (Lodgment Nos. 1-3.) On August 18, 2008, in an unpublished opinion, the California Court of Appeal affirmed the convictions on the murder charges and reversed the convictions on

the other charges. (Lodgment No. 4.) Petitioner then filed a Petition for Review in the California Supreme Court (see Lodgment No. 6), which was denied without comment on November 17, 2008 (Lodgment No. 7).

On September 28, 2009, Petitioner filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court. (Doc. No. 1.) Respondent filed an Answer on January 29, 2010, and Petitioner filed a Traverse on April 5, 2010. (Doc. Nos. 14, 17.)

**IV. Discussion**

**A. Standard of Review**

Title 28, United States Code, § 2254(a) sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

The current Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320 (1997). As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on

the correctness of the state court's decision." <u>Harrington v. Richter</u>, 131 S. Ct. 770, 786 (2011) (citing <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). As amended by AEDPA, § 2254(d) permits habeas relief only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." <u>Id.</u> at 786. "[A] state prisoner must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Id.</u> at 786-87.

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 801-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. <u>See</u> <u>Delgado v. Lewis</u>, 223 F.3d 976, 981-82 (9th Cir. 2000) (overruled on other grounds by <u>Lockyer</u>, 538 U.S. at 75-76); <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]," the state court decision will not be "contrary to" clearly established federal law. <u>Id.</u>

**B.   The Admission of the Contested Evidence at Trial Did Not Violate Petitioner's Right to Due Process**

In the single ground for relief raised in his Petition, Petitioner contends that the trial court violated his right to due process by admitting into evidence (1) photographs of Petitioner brandishing firearms, (2) evidence that Petitioner possessed an inoperable firearm at the time he was arrested, (3) rap lyrics written by Petitioner, and (4) gang evidence. (Pet. at 6.) Petitioner asserts that the

cumulative impact of this evidence deprived him of his Fourteenth Amendment right to a fundamentally fair trial. (Id.)

Respondent argues that Petitioner's challenges to the trial court's evidentiary rulings do not warrant federal habeas relief as they involve issues of state law. (Resp't Mem. at 5-6.) Respondent further contends that to the extent Petitioner alleges the admission of the evidence violated his due process rights, the California Court of Appeal's rejection of Petitioner's claim was neither contrary to nor an unreasonable application of clearly established federal law. (Id.)

### 1. The Photographs

Petitioner argues that the photographs admitted into evidence of Petitioner brandishing firearms were "in no way similar to the circumstances of the charged crimes, and so were not probative of intent, but were instead impermissible 'proclivity' evidence." (Pet. at 6.)

In denying Petitioner's claim, the California Court of Appeal stated:

> The prosecution sought to introduce numerous photographs showing Ojito brandishing guns while posing with fellow gang members. The prosecutor asserted the photographs were relevant (1) to show Ojito had access to guns, (2) to show how Ojito's gang had evolved from a tagging crew to a criminal gang, and (3) as circumstantial evidence bearing on Ojito's intent at the time of the shootings. The defense objected that the photographs were irrelevant to showing Ojito's intent in rebuttal of his claim of . . . self defense, the evidence was unduly prejudicial under section 352 [of the California Evidence Code], and there was no foundational showing that the photographs were taken near the time of the shootings. The court ruled that, although the photographs were cumulative as to the first theory of relevance (because Ojito admitted having access to the guns he used) and the second theory (i.e. the gang's evolutionary history) was tangential to any disputed issue in the case, the issue of Ojito's intent was the core disputed issue. The court concluded that, because the jury would be required to decide whether Ojito shot the victims in self-defense or whether he killed them because he harbored animosity toward KN members and believed violence was a commendable quality, photographs showing Ojito coupled gang affiliation with glorification of violence was relevant circumstantial evidence that could tend to show his intent was retribution toward a rival gang.
>
> We conclude the trial court did not abuse its discretion in concluding the evidence was relevant and not unduly prejudicial. Evidence showing Ojito closely associated his gang membership with being armed with firearms has some tendency in reason to show that

> affronts to his gang provided motivation for Ojito to engage in violent retaliation, regardless of whether the threats from the other gang were de minimus or had ceased, and therefore it was not an abuse of discretion to determine the photographs were relevant to a disputed issue. Moreover, because Ojito had already told police (and the evidence was undisputed) that he was a gang member and was armed when he confronted KN members outside of his apartment, it was not an abuse of discretion to conclude that photographs showing his gang affiliation and possession of weapons was not so unduly inflammatory that their prejudicial effect outweighed their probative value under section 352.
>
> Ojito asserts the evidence was inadmissible under Evidence Code section 1101 as prior bad acts evidence. Ojito did not interpose this objection at trial, and the issue is thus not preserved for appeal. However, even assuming the issue was preserved, the trial court noted the evidence was not being offered as character evidence, but was instead being offered on issues of intent and motive, both of which are acceptable exceptions under Evidence Code section 1101, subdivision (b), to support the admission of the photographs.

(Lodgment No. 4 at 20-22.)

The admission of evidence is an issue of state law. Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009). "Simple errors of state law do not warrant federal habeas relief." Id. (citing Estelle v. McGuire, 502 U.S. 62, 67 (1991)). According to the Ninth Circuit,

> We are not a state supreme court of errors; we do not review questions of state evidence law. On federal habeas we may only consider whether the petitioner's conviction violated constitutional norms. . . . We therefore consider whether the admission of the evidence so fatally infected the proceedings as to render them fundamentally unfair.

Jammal v. Van De Kamp, 926 F.2d 918, 919 (9th Cir. 1991) (citations omitted).

"A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005). The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." Dowling v. United States, 493 U.S. 342, 352 (1990). "Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,'

as laid out by the Supreme Court." Holley, 568 F.3d at 1101. There is no clearly established Federal law, as determined by the U.S. Supreme Court, on the issue of whether "admission of irrelevant or overtly prejudicial evidence constitutes a due process violation." Id. Thus, it cannot be said that the California Court of Appeal's rejection of this claim was contrary to or an unreasonable application of clearly established federal law.

Additionally, pursuant to Jammal, "[o]nly if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process." Jammal, 926 F.2d at 920. Here, as the California Court of Appeal explained, the photographs in this case helped the jury determine whether Petitioner acted in self-defense or in retribution toward a rival gang when he shot Larson Tufi and Jose Alegria. (Lodgment No. 4 at 21-22.) The jury could draw from the photographs inferences about Petitioner's affiliation with a criminal street gang and further infer from such affiliation that Petitioner might act violently towards members of rival gangs; this tends to show a motive for the shooting other than self-defense. No established Supreme Court precedent renders such inferences impermissible. Holley, 568 F.3d at 1101. Because it is not the case that there were *no* permissible inferences the jury could draw from the photographic evidence (see Jammal, 926 F.2d at 920), admission of this evidence did not violate due process.

### 2. The Inoperable Firearm

Petitioner argues that the "evidence of the inoperable firearm was inadmissible character evidence" and that there was no evidence that the gun "was linked to the incidents giving rise to this case." (Pet. at 6; Traverse at 4.)

The California Court of Appeal, in disposing of Petitioner's claim concerning the inoperable firearm, stated:

> The [trial] court rejected the defense argument that the inoperable firearm should be excluded because it only showed [Ojito's] character for possessing guns and was therefore inadmissible character evidence under Evidence Code section 1101, subdivision

> (a). Instead, the trial court concluded the inoperable gun was circumstantial evidence of Ojito's intent at the time of the shootings because it buttressed the inference that Ojito, by frequently arming himself with weapons and acquiring weapons that could be available for future use,[8] showed he was willing to engage in confrontations knowing he had firepower at his disposal to use in such confrontations.
>
> Ojito asserts that when the prosecution proves a specific gun was used in the crime, it may be error to admit evidence of other weapons found in the defendant's possession where its purpose is "to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." [Citation omitted.] Here, however, Ojito admitted to being the shooter in both shootings, and the inoperable firearm was not admitted to show Ojito was likely to have been carrying a weapon, but was instead to show Ojito entered these confrontations carrying tools to accomplish his intended goals. Because the evidence was relevant to Ojito's intent and motive, it was admissible under Evidence Code section 1101, subdivision (b).
>
> > [8] Although the weapon was inoperable, the evidence permitted the conclusion that Ojito acquired [the] firearm believing it worked and, even after learning it was missing the firing pin, he kept it expecting he could repair it to make it operable.

(Lodgment No. 4 at 22-23.)

As noted above, it is not the province of a federal habeas court to review state court determinations on questions of state law. See Estelle, 502 U.S. at 67-68. Again though, if the admission of the inoperable gun evidence was so fundamentally unfair as to result in a denial of due process, relief may be granted on that basis. Estelle, 502 U.S. at 72. Only if there are no permissible inferences that the jury may draw from the evidence can its admission rise to the level of a due process violation. Jammal, 926 F.2d at 920. Here, as the state appellate court determined, there were rational inferences, not constitutionally impermissible, that the jury could draw from the evidence of the inoperable gun evidence; namely, that the evidence tended to show Ojito entered confrontations carrying weapons for use in the confrontations. It is of no matter that the inoperable firearm was not the one used in the shootings at issue;   evidence is relevant if it tends to make any fact relevant to the elements of the crime more or less probable. McKinney v. Rees, 993 F.2d 1378, 1382 (9th Cir. 1993). Because it is not the case that

there were *no* permissible inferences the jury could draw from the inoperable gun evidence (see Jammal, 926 F.2d at 920), admission of evidence relating to the gun did not violate due process.

### 3. The Rap Lyrics

Petitioner argues that "[t]he lyrics were inflammatory, and not sufficiently probative of [his] intent at the time of the crimes." (Pet. at 6.) Respondent contends that the lyric evidence was relevant to prove a key part of the prosecution's theory of the case: "*why* Ojito would have shot and killed the victims over being shot at by BB's." (Resp't Mem. at 11.)

In regard to the propriety of the admission of this evidence, the California Court of Appeal stated:

> Ojito asserts the admission into evidence of rap lyrics he composed approximately a year after the shootings was an abuse of discretion. The lyrics were amenable to the interpretation that Ojito glorified violence, harbored animosity toward KN members (and specifically Jose Alegria, one of the murder victims), and was content with his violence toward KN members.[9] The prosecution asserted the lyrics showed Ojito harbored animosity toward KN members, and was manifesting a willingness to violently act toward KN members, and this was relevant to his intent when he confronted them during the two shootings. The defense objected that the lyrics were irrelevant to Ojito's intent (because the lyrics were written long after the shootings), and any probative value was outweighed by its prejudicial impact. The court ruled the evidence was relevant to showing Ojito's intent, and that its probative value outweighed its prejudicial impact.
>
> The trial court correctly ruled that Ojito's state of mind and attitude after the crime, by expressing continued pride in and approval of killing enemy gang members rather than regret, was relevant to negate his claim that the killings were not the unfortunate result of necessary self-defense but were instead the result of Ojito's animosity toward KN members. [Citation omitted.] Although the temporal separation between the events and the lyrics provided the defense an opportunity to argue they should be discounted, that argument goes to the weight rather than the relevance and was a question for the jury.
>
> Moreover, we cannot conclude the trial court abused its discretion when it rejected the defense's section 352 objection. The trial court carefully considered whether the danger of undue prejudice outweighed the probative value of the evidence. The court noted the core issue in the case was Ojito's motive, stating the central dispute was whether he "[w]as . . . somebody who reasonably feared for his life or feared he was facing great bodily injury, or was [he] somebody who was in another beef with these people and wanted to kill them and did his best to do so?" and "that's in fact the very relevance for which [the lyrics] are offered. It's not like the glorification of violence is a . . . side trip . . . . What the People are

> trying to get across [is] that this wasn't self-defense, this is someone who wanted to commit acts of violence and had an occasion to do so."
>
> The undue prejudice section 352 is designed to preempt is the harm from evidence that, by its unique nature, has very little effect on the issues while simultaneously tending to evoke an emotional bias against the defendant as an individual. Section 352 addresses ""not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors. [Citation.]" [Citation.]' [Citation.] In other words, evidence should be excluded as unduly prejudicial *when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.* In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." (*Vorse v. Sarasy* (1997) 53 Cal. App. 4th 998, 1009.) The evidence was offered for a legitimate purpose (to show Ojito approved of group violence toward KN members) to assist on the pivotal issue--*why* Ojito inflicted violence on KN members during the shootings. We conclude it was not a clear abuse of discretion for the court to reject Ojito's section 352 objection.
>
> > [9] The lyrics included the phrases "all you x faggots is jealous, pull your gun out and blast. I dare you x faggots to open fire, I'll murder that ass & disappear before the cops come running. My Glocks spittin rounds fags droping down clutchin they stomach. Its southwest TNS . . . ." The term "faggots" was a derogatory appellation for KN members, and the lyrics also . . . contained the crossed-out word "vicious," the gang nickname for Alegria.

(Lodgment No. 4 at 24.)

Again, the admissibility of evidence is a matter of state law, and is not reviewable in this proceeding. See Estelle, 502 U.S. at 67. But, if the admission of the lyrics evidence was so fundamentally unfair as to result in a denial of due process, relief may be granted on that basis. Id. at 72. Only if there are no permissible inferences that the jury may draw from the evidence can its admission rise to the level of such a due process violation. Jammal, 926 F.2d at 920. Here, the lyrics evidence was admitted because the jury could draw a permissible inference about Petitioner's hostility toward other gangs, and specifically the gang of which the shooting victims were a part. This inference directly related to Petitioner's intent as it pertained to his claim of self defense; if Petitioner could be shown to have a hostility toward KN gang members, it would make his claim of self-defense less credible. Because the lyrics evidence was probative of

Petitioner's intent, the jury could have drawn a permissible inference from the evidence. Therefore, the admission of the lyrics evidence did not violate Petitioner's right to due process.

### 4. Expert Gang Testimony

Petitioner argues that the admission of expert gang testimony was irrelevant, cumulative, and inflammatory, and that "rather than proving a matter at issue in this case, it was designed to show appellant should be convicted because he was the leader of a violent and dangerous criminal street gang." (Pet. at 6; Traverse at 5-6.)

The California Court of Appeal dispensed with Petitioner's assertion that admission of certain gang testimony was improper as follows:

> Ojito finally asserts the trial court erroneously permitted an expert to testify concerning gangs. Ojito asserts the evidence was irrelevant and inflammatory, and the erroneous admission was prejudicial. However, Ojito concedes on appeal that some of the gang evidence was relevant to the disputed issues: it was relevant to the issue of motive insofar as the evidence showed the shootings occurred in the context of a gang rivalry in which Ojito and the victims were members of competing gangs, and was also relevant to interpreting the evidence (e.g. the "crossing out" of names, and of gang attitudes towards rats and snitches) the jury was to consider.
>
> The only evidence Ojito on appeal asserts was evidence that should not have been admitted at all[] was the expert's discussion of (1) whether TNS and KN met the criteria for a criminal street gang, and (2) the evolution of TNS from a "tagging crew" to a criminal street gang. However, the evidence described by Ojito was a minor component of the expert's testimony, and was largely provided as a foundation for the expert's knowledge and expertise as to the TNS and KN gangs and as a backdrop against which the expert could more particularly describe his opinions on the more central issues in the case on which Ojito concedes his opinions were relevant.[11] We are convinced the trial court correctly permitted the expert to generally and briefly discuss the nature of street gangs and his particularized knowledge of the history of TNS and KN for foundational purposes. Moreover, even if that evidence should have been excluded, it is not reasonably probable Ojito would have obtained a more favorable result even if the expert's testimony could have been sanitized to remove all references to TNS's evolution and whether TNS was a criminal street gang.
>
> > [11] The expert's direct testimony consisted of 41 pages of reporter's transcript, and the cross-examination covered another 20 pages, but the testimony devoted to the complained-of evidence totaled less than six pages of the expert's direct testimony, and much of that testimony was foundational for the expert's opinion that TNS and KN were rival gangs and Ojito was a documented member of TNS.

(Lodgment No. 4 at 25-28.)

This Court cannot review the admission of the gang expert's testimony for error on state law grounds. See Estelle, 502 U.S. at 67-68. For Petitioner to be granted relief based on the admission of the gang expert's testimony, the admission of the testimony must have been so fundamentally unfair as to have resulted in a denial of due process. Estelle, 502 U.S. at 72. Once again, if a jury could have made any permissible inference based on the gang expert's testimony, the admission of that testimony cannot be considered a violation of due process. Jammal, 926 F.2d at 920.

The gang evidence was provided to the jury in the testimony of Detective Ernest Encinas during direct examination by the prosecutor. (Lodgment No. 9, Reporter's Transcript ("RT") at 3783-824.) Detective Encinas testified that he had extensive experience investigating and interacting with gangs. (Id. at 3783-88.) He testified that he was familiar with TNS and that Petitioner was known as "Mist" within TNS. (Id. at 3788-89.) He gave testimony that there are gang "territories." (Id. at 3794.) He defined "criminal street gang" as "a group of three or more individuals who associate on a regular basis; who have a name; claim a turf or territory; who contribute to the deterioration of a neighborhood; and more important, is their involvement in criminal activity." (Id.) He said he knew of TNS, and had first heard of TNS while investigating the March 1, 2002 murders (known as the "5000 Logan Incident"), had investigated other crimes allegedly committed by TNS members, and had spoken to people who claimed to be members of TNS. (Id.) He said that TNS members had told him that they claimed Southeast San Diego as their territory. (Id. at 3795.) He was aware that TNS members had been implicated in murder, robbery, car-jackings, break-ins of schools, weapons violations, graffiti, and witness intimidation. (Id.) The detective testified that TNS had evolved from a "tagging crew" into a violent street gang. (Id. at 3796.) He said that the gangs UF and KN were aligned, and that KN members "graduate" to UF. (Id. at 3798.) He said UF and KN were enemies of TNS and that UF and KN also claim "Southeast" as their territory. (Id. at 3799-800.) He testified that UF and KN were

violent street gangs. (Id. at 3800-02.) He identified tattoos belonging to Petitioner and a hat Petitioner wore in a picture as affiliating Petitioner with TNS. (Id. at 3806, 08.) The detective then interpreted the photographs discussed above as to what they indicated concerning the gang affiliation of the subjects and which types of weapons were depicted. (Id, at 3811-19.) He testified that gang members increase their status within a gang through violent and criminal acts. (Id. at 3819-20.) He detailed the process police use to document gang membership of individuals. (Id. at 3821-23.) Finally, Detective Encinas testified that Petitioner was a documented gang member and that Petitioner had admitted his gang affiliation to the detective in an interview. (Id. at 3824.)

The thrust of the gang expert's testimony was to establish that Petitioner was a member of a criminal street gang and that the victims' gang was the enemy of Petitioner's gang. The testimony brought this point across clearly, but not without a substantial amount of foundation laid for his opinion. In order for the expert to express his opinion that Petitioner was in a gang and that the victims were enemies of that gang, the expert had to explain the background of those gangs, the reasons for the expert's knowledge about the gangs, the indications that a person was a member of a gang, why gangs in general might be violent toward one another, and why these particular gangs were violent toward one another. At each step of the gang expert's testimony, the jury, by the prosecutor's design, could draw a further inference about Petitioner's intent and motive in shooting the victims. The jury could draw a permissible inference about Petitioner's intent and motive in shooting the victims; the gang expert's testimony made Petitioner's claim of self defense less credible. See, e.g., U.S. v. Santiago, 46 F.3d 885, 889 (9th Cir. 1995) (finding gang evidence relevant to motive).

Because the gang evidence led the jury to a permissible inference, the admission of the evidence did not violate Petitioner's right to due process of law. Estelle, 502 U.S. at 72; Jammal, 926 F.2d at 920.

//

### 5. The Cumulative Effect of the Disputed Evidence on Petitioner's Right to Due Process

Petitioner claims that the cumulative effect of the admission of all of the evidence discussed above amounted to a denial of his right to due process. (Pet. at 6.) None of the contested evidence gives rise to a ground for federal habeas relief because a jury could make a permissible inference based on each piece of evidence discussed. See Jammal, 926 F.2d at 920. Because Petitioner has not demonstrated any single constitutional error in this case, "there is nothing to accumulate to a level of a constitutional violation." Mancuso v. Olivarez, 292 F.2d 939, 957 (9th Cir. 2002). The California Court of Appeal's rejection of Petitioner's arguments regarding the contested evidence was neither contrary to nor an unreasonable application of clearly established federal law. Accordingly, the Court recommends that the Petition be denied.

## V. Conclusion and Recommendation

After a thorough review of the record in this matter, the undersigned magistrate judge finds that Petitioner has not shown that he is entitled to federal habeas relief under the applicable legal standards. Therefore, the undersigned magistrate judge hereby recommends that the Petition be **DENIED WITH PREJUDICE** and that judgment be entered accordingly.

This Report and Recommendation is submitted to the Honorable Larry A. Burns, United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). **IT IS ORDERED** that not later than **March 25, 2011**, any party may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation." **IT IS FURTHER ORDERED** that any reply to the objections shall be served and filed not later than **April 4, 2011**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153

//

1  (9th Cir. 1991).

2  **IT IS SO ORDERED.**

3  DATED:  March 2, 2011

4  
                                                    Jan M. Adler

5                                                      U.S. Magistrate Judge